Filed 8/22/16  P. v. Peerman CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E063271 |
| v. | (Super.Ct.No. RIF1304505) |
| JOSHUA AARON PEERMAN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Elisabeth Sichel, Judge.

Affirmed.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Collette C. Cavalier and Arlene A. Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Joshua Aaron Peerman fled from the police while driving a stolen two-ton pickup truck.  Speeding down residential streets, he ran three stop signs; when he

reached an intersection with a busier street, he ran a red light and hit a Toyota sedan, killing the driver. As a result, he was convicted of second degree murder, along with other offenses.

Defendant now contends:

1. There was insufficient evidence that defendant was subjectively aware of the risk to human life to support a finding of implied malice.

2. Defendant's admission of two prior prison term enhancements was invalid because he was not given the necessary advisements.

We find no prejudicial error. Hence, we will affirm.

I

FACTUAL BACKGROUND

On May 27, 2013 — Memorial Day — at 4:00 or 4:30 a.m., one Timothy Reilly heard a noise in front of his house in Norco. He looked out and saw two men hurriedly unhitch a utility trailer, then drive away in a truck.

Reilly suspected the trailer was stolen, so he phoned the police. When Deputy Jonathan Kehrier responded, Reilly gave him a description of the men's truck. Deputy Kehrier determined that the trailer was indeed stolen.

Around 6:00 a.m., Deputy Kehrier was parked near Reilly's house, doing paperwork, when he saw a black Nissan pickup truck go by. He realized that it matched Reilly's description, so he followed it. At one point, it turned into a driveway, and he lost sight of it. He was not sure which driveway it had gone into, so he parked and waited.

2

Meanwhile, Reilly had also seen the truck go by his house and had also followed it. On seeing Deputy Kehrier, he stopped and told him that the truck was the one he had seen.

A few minutes later, the truck came back out of the driveway. Deputy Kehrier followed it a short distance, then turned on his overhead lights. The truck pulled over.

There were two people inside — defendant was the driver, and his girlfriend Amanda Smith was the passenger. Both defendant and Smith used methamphetamine "frequently." As a result of methamphetamine use, they had not slept all weekend.

As Deputy Kehrier was walking up to the truck, he told defendant to put his hands on top of the steering wheel. Defendant looked at Deputy Kehrier, "gave [him] a . . . little smirk," and "took off[.]" Deputy Kehrier got back in his patrol car and gave chase. His overhead lights were still on.

At Eighth and California, defendant ran a stop sign; he did not even brake or slow down. There were some other cars on California, although not right at the intersection.

At Pedley and Eighth, defendant made a left turn, once again running a stop sign without braking or slowing down.

At Pedley and Seventh, he ran a third stop sign.

The pursuit went down residential streets that had speed limits of 25 miles an hour. Defendant was going at "freeway speeds," from 50 to 80 miles an hour.

Smith testified that on a scale from one to ten, where ten meant "really extremely life-threatening[ly] fast," defendant's speed was a ten. She was "scared for her life." She repeatedly asked him to pull over. She told the police that she said, "You need to stop.

3

Stop the fucking car." Defendant replied, "Then jump out of the fucking car 'cause I'm not stopping." At trial, however, she testified that he said, "When I pull over, you can jump out."

At Pedley and Sixth, defendant ran a red light. Yet again, he did not even brake. This time, he hit a Toyota sedan broadside. Jesus Perez-Roblero, the driver of the Toyota, was killed. The truck rolled over, but defendant and Smith had only minor injuries. Defendant displayed distress regarding Smith's injuries, repeatedly saying, "She's hurt. She's hurt." He did not ask about the occupant of the other vehicle.

According to an expert accident reconstructionist, at the moment of impact, the truck was going a minimum of 45 miles an hour.[1]

Sixth Street is a thoroughfare, not a residential street. Traffic on Sixth was "light"; a couple of cars were going west, and "some" cars were going east.

The truck turned out to be stolen.

On October 12, 2013, while defendant was in jail, he phoned his mother and asked her to tell "you know who" to "plead the Fifth." Later that day, defendant's mother spoke to Smith and said, "I have an important message to relay to you from Josh.

---

[1] The People state, "Assuming the Toyota was going the speed limit of 35 miles per hour, the impact speed of the [truck] was 63.23 miles per hour." This is a misunderstanding of the expert's testimony. Actually, based on evidence that the pursuit lasted 74 seconds (as shown by dispatch logs) and covered 1.3 miles (as measured by Deputy Kehrier after the fact), he testified that Deputy Kehrier's average speed was 63.23 miles per hour. It is inferable that defendant's average speed was the same or higher. This calculation sheds no light on defendant's speed at impact. Moreover, it does not depend on the speed of the Toyota.

4

There's probably going to be some people coming to talk to you. Don't talk to them. Plead the Fifth." On October 22, 2013, an investigator from the district attorney's office interviewed Smith; she answered every question with, "I plead the Fifth."

II

PROCEDURAL BACKGROUND

After a jury trial, defendant was found guilty of:

Count 1: Second degree murder. (Pen. Code, § 187, subd. (a).)[2]

Count 3: Recklessly evading an officer. (Veh. Code, § 2800.2.)

Count 4: Unlawfully taking or driving a vehicle (Veh. Code, § 10851, subd. (a)), specifically a flatbed trailer, on May 27, 2013.

Count 5: Unlawfully taking or driving a vehicle, specifically a 2004 Nissan Frontier, on May 27, 2013.

Count 6: Dissuading a witness. (Pen. Code, § 136.1.)

In addition, defendant pleaded guilty to:

Count 7: Unlawfully taking or driving a vehicle, specifically a Volkswagen Jetta, on May 10, 2013.

Count 8: Unlawfully taking or driving a vehicle, specifically a Chevrolet C3500, on January 16, 2013.

---

[2] The prosecution had charged defendant in Count 1 with first degree murder, on a theory of kidnapping felony murder, and in Count 2 with kidnapping. (Pen. Code, § 207, subd. (a).) The jury found him not guilty of first degree murder. It hung on count 2, and the trial court dismissed this charge.

Count 9:  Receiving a stolen vehicle (Pen. Code, § 496d, subd. (a)), specifically a Chevrolet C3500, on January 16, 2013.

In a bifurcated proceeding, after waiving a jury, defendant admitted two one-year prior prison term allegations.  (Pen. Code, § 667.5, subd. (b).)

As a result, he was sentenced to a total of 22 years 4 months to life in prison, along with the usual fines, fees, and miscellaneous orders.

III

THE SUFFICIENCY OF THE EVIDENCE OF IMPLIED MALICE

Defendant contends that there was insufficient evidence that he was subjectively aware of the danger to human life to support a finding of implied malice.

""""When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  [Citation.]  We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  [Citation.]  In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."'  [Citation.]"  (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212-1213.)

"'Murder is the unlawful killing of a human being . . . with malice aforethought.'  [Citation.]  Malice aforethought may be express or implied.  [Citation.]  'Express malice

6

is an intent to kill . . . . Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses.' [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 941-942.) "[A] finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard. [Citation.]" (*People v. Watson* (1981) 30 Cal.3d 290, 296-297, disapproved on other grounds in *People v. Sanchez* (2001) 24 Cal.4th 983, 991, fn. 3.) Here, there is no evidence that defendant had the intent to kill. Accordingly, to support his conviction for murder, there must be sufficient evidence that he subjectively appreciated the risk he created.

Several cases have held that reckless driving can give rise to an inference of subjective awareness of the resulting risk.

In *People v. Fuller* (1978) 86 Cal.App.3d 618, a police officer spotted the defendants as they were in the act of stealing tires from a car lot. The defendants got into their car and attempted to make a getaway. (*Id*. at pp. 621-622.) "[A] high speed chase ensued which eventually resulted in [the defendants'] car running a red light . . . and striking another automobile which had entered the intersection. The driver of the other automobile was killed. . . . The chase from the car lot covered some seven miles and lasted approximately 10 to 12 minutes. During the chase the [defendants'] car narrowly missed colliding with several other cars including two police vehicles that were positioned to block their escape." (*Id*. at p. 622.)

7

The trial court granted a motion to dismiss a murder charge. (*People v. Fuller*, *supra*, 86 Cal.App.3d at p. 621.) The appellate court reversed. (*Id*. at p. 629.) It held, among other things, that there was sufficient evidence of second degree implied malice murder. (*Id*. at pp. 628-629.) It explained: "[The defendants] drove at high speeds through main thoroughfares . . . . At one point in the chase they drove on the wrong side of [the street] and caused oncoming cars to swerve off of the road to avoid a head-on collision. They then made a U-turn and sped back . . . , ran a red light and caused other traffic to stop to avoid a collision. [The defendants] then drove . . . at speeds estimated between 60 and 75 miles per hour and headed straight at two oncoming police vehicles which were attempting to block their flight. [The defendants] did not reduce their speed as they approached the officers' vehicles, and only a last minute maneuver by the officers avoided a possible fatal collision. At the next intersection [the defendants'] vehicle which 'hadn't slowed down very much' ran the red light and struck and killed the driver of the other car. Under these facts the foreseeability of serious injury or death was apparent to [the defendants]. [Citations.]" (*Id*. at p. 629; see also *People v. Caldwell* (1984) 36 Cal.3d 210, 218 [citing *Fuller* approvingly].)

In *People v. Moore* (2010) 187 Cal.App.4th 937, the defendant was driving 80 to 90 miles an hour in a 35 miles an hour zone. At one point, he crossed over the double yellow line, forcing drivers going in the opposite direction to move out of his way. While still going 70 miles an hour, he ran a red light and hit another car, killing a passenger. A jury found him guilty of, among other things, second degree murder. (*Id*. at p. 939.)

8

The appellate court held that there was sufficient evidence of implied malice. (*People v. Moore*, *supra*, 187 Cal.App.4th at pp. 940-942.)  It acknowledged that:  "The facts must demonstrate the defendant had a subjective awareness of the risk.  [Citation.] It is not enough that a reasonable person would have been aware of the risk.  [Citation.]" (*Id*. at p. 941.)  It also conceded that, in *Fuller*, "a prior near-miss gave the defendant a warning."  (*Id*. at p. 942.)  However, it concluded that that distinction was not controlling. (*Ibid*.)

It then stated:  "Here Moore drove 70 miles per hour in a 35-mile-per-hour zone, crossed into the opposing traffic lane, caused oncoming drivers to avoid him, ran a red light and struck a car in the intersection without even attempting to apply his brakes.  His actions went well beyond gross negligence.  He acted with wanton disregard of the near certainty that someone would be killed.  [¶]  Whether Moore was subjectively aware of the risk is best answered by the question:  how could he not be?  It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, Moore was aware of the risk."  (*People v. Moore, supra,* 187 Cal.App.4th at p. 941.)

In *People v. Young* (1992) 11 Cal.App.4th 1299, the police pursued the defendant, who was driving a car that he had just carjacked.  (*Id*. at pp. 1303-1304.)  He went up to 70 miles an hour on main streets and 50 miles an hour on residential streets.  He made a right turn on red without stopping, forcing cross-traffic to brake to avoid a collision.  He "briefly" drove on the wrong side of the road, "causing several cars to veer to avoid striking him."  (*Id*. at p. 1304.)  He ran three red lights; when he ran a fourth, he hit other

9

cars, killing one person. (*Ibid*.) He was convicted of several offenses, including first degree felony murder. (*Id*. at p. 1302.)

In the course of discussing the defendant's claim of cruel and unusual punishment (*People v. Young, supra,* 11 Cal.App.4th at pp. 1308-1311), the appellate court stated: "[T]he . . . death of a bystander during appellant's reckless high-speed flight in the stolen vehicle involves an application of the felony-murder rule which is by no means bizarre or unforeseeable. . . . Although appellant attempts to characterize the death as resulting from 'accident,' *the pattern of appellant's driving supports the conclusion that appellant harbored a conscious disregard for human life which constituted implied malice*, sufficient to render the homicide a murder even without its connection to the prior robbery. [Citations.]" (*Id*. at p. 1309, italics added.)

Here, defendant had not slept all weekend. Nevertheless, he drove 50 to 80 miles an hour in residential areas where the speed limit was 25 miles an hour. He ran three stop signs without braking or slowing down; at one of these stop signs, there were cars on the cross-street, though (fortunately) they had not reached the intersection. Finally, at Sixth Street, he ran a red light, again without braking. Although it was early in the morning on Memorial Day and traffic was light, Sixth Street is a thoroughfare and there were cars going both ways.

Significantly, Smith was aware of the danger. She testified that defendant was driving "really extremely life-threatening[ly] fast . . . ." She was "scared for her life." She was yelling at him and asking him to pull over. As Smith was subjectively aware of

10

the danger, it is reasonably inferable that defendant was, too.  Indeed, much as in *Moore*, we may well ask, how could he not be?

Defendant argues that he was not intoxicated.  However, he was sleep-deprived, which can impair driving just as much as intoxication can.  In any event, the defendants in *Fuller*, *Moore*, and *Young* were not intoxicated, either.

Defendant also argues that he made "a hasty decision" to flee.  However, the entire pursuit lasted at least 74 seconds.  We urge the reader to pause and measure out a minute and a quarter.  (We'll wait.)  This is more than enough time to form a subjective appreciation of the risk.

We therefore conclude that there was sufficient evidence of implied malice.

IV

DEFENDANT'S ADMISSION OF THE PRIOR PRISON TERM ENHANCEMENTS

Defendant contends that his admission of the prior prison term enhancements was invalid because he was not given the necessary advisements.

A.      *Additional Factual and Procedural Background*.

On September 12, 2014, while the jury was deliberating, defense counsel advised the trial court that defendant wanted to waive a jury trial on the prior prison term enhancements.  He said:  "I have explained to my client, and he understands his right to have a jury trial on the priors. . . .  He's waiving that right."  Defendant confirmed this.

On March 12, 2015, the date set for a trial on the enhancements, there was this discussion:

"THE COURT: . . . [¶] [Defense counsel], have you had an opportunity to discuss with your client what he wishes to do with respect to the prison priors?

"[DEFENSE COUNSEL]: Yes, Your Honor. He would like to admit those priors. I have advised him of his right to a court trial on that. He had previously waived his right to a jury trial.

"THE COURT: All right.

"[DEFENSE COUNSEL]: And there's no issue that he has in fact suffered those two prison priors. I reviewed the 969b packet. It is his photograph. And my client doesn't have an issue with admitting those two priors.

"THE COURT: All right. Is that correct, sir?

"THE DEFENDANT: Yes, Your Honor.

"THE COURT: All right. And you understand that there's no promise made with respect to sentencing on the priors?

"THE DEFENDANT: Yeah.

"THE COURT: All right. And so, with respect to the first prior, which is a conviction date of July 30th, 2004, for a violation of Vehicle Code 2800.2, do you wish to admit or deny that prior?

"THE DEFENDANT: Admit.

"THE COURT: And is that because in fact you did commit the violation as described in the Information in this case?

"THE DEFENDANT: Yes, Your Honor.

12

"THE COURT:  All right.  And with respect to the second prior with a date of conviction of July 16th, 2008, for a violation of Health and Safety Code 11378, do you wish to admit or deny that prior?

"THE DEFENDANT:  Admit.

"THE COURT:  And is that because in fact you did commit the offense as alleged in this Information in this case?

"THE DEFENDANT:  Yes, Your Honor.

"THE COURT:  All right.  Then the court finds both prison priors to be true."

B.  *Failure to Advise Defendant of His Rights*.

Defendant argues that the trial court failed to advise him of the rights he was waiving by admitting the enhancements.

Under *In re Yurko* (1974) 10 Cal.3d 857, "before a court accepts an accused's admission that he has suffered prior felony convictions," it must give him "express and specific admonitions as to the constitutional rights waived by an admission." (*Id*. at p. 863.)  These rights are threefold:  "'First, is the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment . . . .  Second, is the right to trial by jury. . . .  Third, is the right to confront one's accusers. . . .' [Citation.]" (*Id*. at p. 863, fn. 5.)

"*Yurko* error is not reversible per se.  Instead, the test for reversal is whether 'the record affirmatively shows that [the admission] is voluntary and intelligent under the totality of the circumstances.' [Citations.]" (*People v. Cross* (2015) 61 Cal.4th 164, 171.)

13

The Supreme Court applied this test in *People v. Mosby* (2004) 33 Cal.4th 353. There, the trial court bifurcated the trial of a prior conviction allegation. After the trial on the substantive offense, but before the jury returned its verdict, the trial court asked the defendant if he wanted a jury trial on the prior. Defense counsel indicated that the defendant wanted to waive a jury trial and to admit the prior. (*Id*. at p. 357.) The trial court advised the defendant of his right to trial by jury, and he waived it. (*Id*. at pp. 357-358.) Later, after the jury returned its verdict finding him guilty, and without any further advisements regarding his right against self-incrimination and his right to confrontation, the defendant admitted the prior. (*Id*. at pp. 358-359.)

The Supreme Court distinguished the case before it, in which the defendant had been given incomplete advisements, from cases in which the defendant had been given no advisements at all. (*People v. Mosby*, *supra*, 33 Cal.4th at pp. 361-362, 364.) It then stated: "'It would exalt a formula . . . over the very standard that the formula is supposed to serve (that the plea is intelligent and voluntary) to suggest that a defendant, who has just finished a contested jury trial, is nonetheless unaware that he is surrendering the protections of such a trial' when after being advised of the right to a trial on an alleged prior conviction the defendant waives trial and admits the prior." (*Id*. at p. 364.)

The court explained that the defendant had just been through a jury trial at which he did not testify, but his codefendant did; thus, he knew he had a right not to testify. (*People v. Mosby*, *supra*, 33 Cal.4th at p. 364.) Similarly, "because he had, through counsel, confronted witnesses at that immediately concluded trial, he would have understood that at a trial he had the right of confrontation." (*Ibid*.) The court also noted

14

that the defendant had pleaded guilty in the prior case, and he would have received advisements at that time. (*Id*. at p. 365.) It concluded: "Under the totality of the circumstances, the Court of Appeal did not err in concluding that defendant voluntarily and intelligently admitted his prior conviction despite being advised of and having waived only his right to jury trial." (*Ibid*., fn. omitted.)

Here, as in *Mosby*, defendant did receive an advisement of his right to a jury trial; thus, he received incomplete advisements, rather than no advisements at all. Also as in *Mosby*, he had been through a bifurcated trial on the underlying offense. Defendant chose not to testify at trial, so presumably he knew he had a right not to testify;[3] his counsel cross-examined witnesses, so presumably he knew he had a right to confrontation. Finally, as in *Mosby*, he had pleaded guilty before. As noted in part II, *ante*, before the trial started, he pleaded guilty to counts 7 through 9. At that time, he was given all of the necessary advisements.

Citing *People v. Lloyd* (2015) 236 Cal.App.4th 49, defendant argues that his admission came too long after trial for it to be presumed that he was still aware of his rights. In *Lloyd*, more than seven months after the end of the trial on the substantive offense, the defendant admitted prior prison term allegations. (*Id*. at pp. 56, 59.) At that time, he was advised of his right to a court trial (he had already waived a jury trial), but

_____

**3** We also note that defendant was legally savvy enough to instruct Smith to "plead the Fifth."

15

he was not advised of his right against self-incrimination or his right to confrontation. (*Id.* at pp. 52, 58.)

The appellate court stated: "We publish this opinion to stress the need for trial courts to advise defendants of *all* their . . . rights and to obtain express waivers thereof. A defendant may knowingly and voluntarily enter an admission of a prior conviction even though the trial court failed to advise the defendant of the right to confront witnesses and to remain silent if a defendant 'just' or 'immediately' completed a jury trial at which he or she did not testify and counsel confronted witnesses on the defendant's behalf. [Citation.] We conclude, however, such an advisement occurring more than seven months later does not mandate the same result." (*People v. Lloyd*, *supra*, 236 Cal.App.4th at p. 53.) It also noted that the record did not show that the defendant had ever pleaded guilty before. (*Id.* at p. 60.)

We may assume, without deciding, that the experience of a long-past trial may be insufficient, standing alone, to support a conclusion that the defendant is aware of his or her rights. Even if so, being tried for murder is a pretty memorable event. We do not believe that the six-month time lapse in this case was so long that defendant could forget that he did not testify at his trial, or that his counsel did cross-examine witnesses. Moreover, unlike in *Lloyd*, that experience does not stand alone. Rather, in addition, defendant pleaded guilty to three counts, and at that time he was expressly advised of each of the relevant rights. Admittedly, that, too, occurred six months before defendant's admission of the enhancement. However, in *Mosby* itself, the defendant had previously pleaded guilty in 1993 (*People v. Mosby*, *supra*, 33 Cal.4th at p. 359); the Supreme Court

16

held that this was evidence that he was aware of his rights at his trial, which took place in 1999 (or possibly even later). (*Id*. at p. 365; see *id*. at pp. 356-357 [re: date].)

We therefore conclude that the trial court's failure to advise defendant that he was waiving his right against self-incrimination and his right to confrontation was harmless.

C. *Failure to Advise Defendant of the Penal Consequences*.

Defendant also argues that the trial court failed to advise him of the legal consequences of admitting the enhancements.[4]

Also under *Yurko*, before a defendant admits a prior conviction, the trial court must advise him or her of the legal consequences of the admission. (*In re Yurko*, *supra*, 10 Cal.3d at pp. 864-865; accord, *People v. Cross*, *supra*, 61 Cal.4th at pp. 170-171.)

"Unlike the admonition of constitutional rights, however, advisement as to the consequences of [an admission] is not constitutionally mandated. Rather, the rule compelling such advisement is 'a judicially declared rule of criminal procedure.' [Citation.] The nonconstitutional basis of the rule has two consequences pertinent to this case.

"First, '[u]nlike an uninformed waiver of the specified constitutional rights which renders a plea or admission involuntary and requires that it be set aside, an uninformed waiver based on the failure of the court to advise an accused of the consequences of an admission . . . requires that the admission be set aside only if the error is prejudicial to the

---

**4**     Somewhat unhelpfully, the People do not respond to this aspect of defendant's contention.

accused.' [Citation.] 'A showing of prejudice requires the appellant to demonstrate that it is reasonably probable he would not have entered his plea if he had been told about the [consequences].' [Citations.] [¶] Second, the error is waived absent a timely objection." (*People v. Walker* (1991) 54 Cal.3d 1013, 1022-1023.)

Here, defendant waived the asserted error by failing to raise the issue below, either at sentencing or by moving to withdraw his admissions. (See *In re J.V.* (2010) 181 Cal.App.4th 909, 913-914.)

Separately and alternatively, the asserted error was not prejudicial. On this record, there is no reason to suppose that defendant would not have made his admissions if he was fully advised. (See *In re J.V.*, *supra*, 181 Cal.App.4th at p. 914.)

V

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.

We concur:

HOLLENHORST

J.

CODRINGTON

J.

18