Filed 9/22/16  P. v. Johnson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C078781 |
| Plaintiff and Respondent, | (Super. Ct. No. SF128140A) |
| v. | |
| DEVON MAURICE JOHNSON, | |
| Defendant and Appellant. | |

Following a jury trial, defendant Devon Maurice Johnson was convicted of second degree robbery, second degree commercial burglary, and being a felon in possession of a firearm.  The jury further found true the allegation that during the commission of the second degree robbery, defendant was armed with a firearm.  In a bifurcated proceeding, defendant admitted having served three prior prison terms.  Defendant was sentenced to eight years in state prison.

On appeal, defendant contends:  (1) the trial court erred by failing to grant his motion for acquittal at the end of the prosecution's case-in-chief because the evidence was insufficient to establish his identity as the perpetrator, (2) even considering the

1

evidence presented by defendant, there was insufficient evidence that he was the perpetrator, (3) the trial court prejudicially erred in admitting defendant's statement that he had illegally possessed firearms in the past, and (4) the trial court failed to adequately advise defendant of his rights to confront witnesses and remain silent prior to defendant's admission of his prior prison terms.

We conclude that the prosecution's case-in-chief, and the evidence as a whole, contained the necessary substantial evidence establishing defendant's identity as the perpetrator of the charged crimes. We further conclude that, though the trial court erred in admitting defendant's statement that he had illegally possessed firearms in the past, the error was harmless. Finally, we conclude, based on the totality of the circumstances, that defendant voluntarily and intelligently admitted the prior prison term allegations.

Finding no reversible error, we affirm.

## I. BACKGROUND

A grand jury indicted defendant on charges of second degree robbery (Pen. Code, § 211—count 1), [1] second degree commercial burglary (§ 459—count 2), and being a felon in possession of a firearm (§ 29800, subd. (a)(1)—count 3.) As to counts 1 and 2, the indictment alleged that defendant was armed with a firearm within the meaning of section 12022, subdivision (a)(1). The indictment further alleged, as to all counts, that defendant had served three prior prison terms within the meaning of section 667.5, subdivision (b). Defendant was tried before a jury.

A.    *The Prosecution's Case-in-Chief*

On January 12, 2013, Crystal Lee was working as a clerk at Web-Man, an internet café in Stockton. Around 11:40 p.m., Lee saw a man walk quickly or jog into an office area towards the back of the café. Lee followed the man, and watched him grab

---

[1] Undesignated statutory references are to the Penal Code.

2

approximately $500 from the cash register. Lee asked, "What are you doing?" The man responded by pushing her into an office chair. Frightened, Lee told the man "to do whatever he wanted." The man left Lee's office. Moments later, Lee saw the man in the café, surrounded by customers. The man broke free and fled, leaving a gun and glove near the door.

During the trial, Lee testified that the robber was wearing a black hoodie, jeans and Nike shoes. The robber also wore a glove on his right hand. The robber's face and hair were covered, but Lee was able to see his forehead. Lee described the robber's complexion as dark brown. Lee, who is five feet and one inch tall, told police that the robber was five feet and eight inches. At trial, however, she estimated that the robber was closer to six feet three inches.

Max Haro was a customer at the internet café. Haro was seated at a computer terminal near the front of the store. While staring at the computer monitor, Haro saw the reflected image of a figure moving quickly towards the office area. Haro turned and saw someone go through the door leading towards the office. He heard a disturbance, and rose from his seat, positioning himself near the entrance/exit door. Haro then saw a masked man emerge from the office area, and run towards the door.

Haro testified that the man was wearing a long beanie, pulled down over his face. Although the man's face was obscured, Haro could see his eyes. Haro also testified that he could also see dark brown dreadlocks sticking out of the man's beanie.

Haro struck the man with a closed fist. The man stumbled or shuffled forward, and a gun fell to the floor from the area around his waist. The man recovered and ran out of the building. Haro picked up the gun barehanded and set it on the counter, on top of a glove that another customer had already placed there. The gun, which was taped around the handle, remained on the counter, untouched, until police arrived.

3

Craig Lease was another customer at the internet café. Lease saw a man come into the café and run towards the office area. Lease testified that he saw the man make contact with Lee, and then run towards the front door.

Lease testified that he could see the man's face, and that he was "black." Lease added that he was wearing a hoodie and holding a gun in his right hand. Lease could not see the man's hair.

Lease saw another customer (later identified as Haro) strike the man, who fell forward, losing his grip on the gun. The gun flew out of the man's hand, and came to rest approximately 15 feet away. The man then ran out of the café.

Stockton Police Officer James Padilla responded to the café shortly before midnight. Padilla testified that he recovered the gun and removed several rounds of live ammunition using his bare hands. The gun was a .32 caliber revolver.

Senior Criminalist Bob Cheseldine analyzed the gun for DNA. Cheseldine's analysis revealed one major contributor and two minor contributors. Most of the DNA found on the gun—93% of the sample—belonged to the major contributor. The DNA profile for the major contributor was uploaded into a database, which returned a match to defendant.

Cheseldine also examined DNA on the ammunition found in the gun. Cheseldine concluded that there was not enough DNA on the ammunition to include or exclude defendant as a possible contributor.

Cheseldine also examined DNA on the glove found on the floor of the café. The glove contained a mixture from at least three different contributors. The major contributor was female. There was not enough DNA from the two minor contributors to include or exclude defendant as a possible contributor.

At trial, Cheseldine acknowledged that he could not tell when DNA was deposited on an object, or who touched the object last. Furthermore, Cheseldine acknowledged that DNA could be transferred from one person to another person, and then to the object.

4

Nevertheless, Cheseldine opined that the probability that the DNA found on the gun was from another African American person was one in 700 quintillion.

Stockton Police Detective Phirun Var interviewed defendant on November 4, 2013. Var testified that defendant stands between five feet ten inches and six feet tall and is right-handed. Var also testified that, at the time of the interview, defendant wore dreadlocks and "the tip of his hair was . . . lighter than the rest of his hair."

The interview was recorded and a redacted version played for the jury. During the redacted recording, defendant acknowledged that he lived near the café at the time of the robbery. Defendant also acknowledged that he had previously committed robberies and had "been caught with guns." We discuss defendant's statements regarding guns in greater detail below.

Despite these admissions, defendant repeatedly denied having committed the robbery. Even as defendant denied robbing the café, he implied that, had he intended to commit a robbery, he would not have been caught. Specifically, defendant stated that he would have been careful to conceal his face and dreadlocks. According to defendant, "First of all, I've done robberies and I never leave my face open." When asked what he ordinarily uses to cover his face, defendant replied, "Anything I can find. A sheet, a shirt, something, because this is like, these [dreadlocks] is like, real noticeable." When informed that witnesses had described the robber as having dreadlocks, defendant responded that his dreadlocks were "fire red" at the time of the robbery.

Defendant also suggested that he could not have committed the crime because he would not have left his gun behind. When Var described the gun recovered from the crime scene as "hella crappy," defendant responded, "I don't care how crappy it looked. As long as it shoots, I'm not leaving it."

When confronted with the results of the DNA analysis, defendant allowed that he might have committed the crime, but forgot having done so, due to his excessive drug use. When asked to explain how his DNA came to be on the gun, defendant

5

hypothesized: "Maybe I coulda touched it.  Somebody I let use it.  But then, then no, 'cuz I want my gun back."  When pressed, defendant insisted:  "I don't know.  It's a good one.  But I know, I don't leave guns.  I pay too much for them.  For real, I don't leave 'em."  Defendant was not able to explain how his DNA came to be on the gun.

B.    *Defendant's Motion in Limine*

Out of the presence of the jury, defendant moved to exclude portions of the recorded interview, including a conversation with Var concerning his prior possession of revolvers.  The transcript of the unredacted recording includes the following exchange:

"[VAR]:            Do you own any guns?

"[DEFENDANT]:   Do I have any guns?

"[VAR]:            Yeah.

"[DEFENDANT]:   No.  I've been caught with guns.  That's my M.O.  I get caught with guns.

"[VAR]:            Yeah, I read a little bit—

"[DEFENDANT]:   Yeah.

"[VAR]:            A little bit about you.  So, what kind of guns do you usually carry?  Or do you usually get caught with?

"[DEFENDANT]:   Revolvers.

"[VAR]:            Revolvers?

"[DEFENDANT]:   Yeah.

"[VAR]:            Okay.  What was the last revolver you had?

"[DEFENDANT]:   A .38?  No, uh, .357.

"[VAR]:            A .357?

"[DEFENDANT]:   I got caught with that.

"[VAR]:            When was this?

"[DEFENDANT]:   I don't know when it was, but that's the last gun I been caught with.

6

"[VAR]:            Was this this year?  Last year?

"[DEFENDANT]:  I can't remember, but it wasn't this year.  I don't think it was last year.

"[VAR]:            How many times you been—

"[DEFENDANT]:  I been caught with, like, 3, 4 guns.

"[VAR]:            3 or 4 guns?  And you're—you normally like to carry revolvers?

"[DEFENDANT]:  Yeah.

"[VAR]:            Why is that?

"[DEFENDANT]:  I don't know.  I just like revolvers.

"[VAR]:            Okay.  Cowboy style?

"[DEFENDANT]:  Yeah.  I just like revolvers.

"[VAR]:            Do you have any other type of guns?  Besides the .357?

"[DEFENDANT]:  That I've been caught with?

"[VAR]:            That you've been caught with, that you own, or you had for a short period of time . . .

"[DEFENDANT]:  I've had a mac.

"[VAR]:            A mac?

"[DEFENDANT]:  A Mac 11.

"[VAR]:            A Mac 11?

"[DEFENDANT]:  Yeah.

"[VAR]:            Okay.  What else?

"[DEFENDANT]:  That's about it.

"[VAR]:            Any other type of revolvers?

"[DEFENDANT]:  I've had a Glock.  A Glock 40. That's about it for guns.

"[VAR]:            And those are the only three guns you been caught with?

"[DEFENDANT]:  Yeah.

7

"[VAR]:          You got caught with a Mac 11?

"[DEFENDANT]:   Yeah."

Defendant moved to exclude the entire conversation concerning his prior possession of guns.  The prosecutor agreed that defendant's statements concerning his prior possession of a Mac 11 and Glock 40 should not be admitted.  However, the prosecutor argued that defendant's statements concerning his preference for and prior possession of revolvers was relevant to establish defendant's identity as the perpetrator of the charged crimes.  The trial court admitted defendant's statements concerning his preference for and prior possession of revolvers.  Defendant's statements concerning his prior possession of a Mac 11 and Glock 40 were redacted from the recording played for the jury.

C.      *Defendant's Motion to Acquit*

At the end of the prosecution's case-in-chief, defendant moved for a judgment of acquittal under section 1118.1, challenging the sufficiency of the evidence as to his identity as the robber.[2]  Specifically, defendant argued that the DNA evidence failed to place him at the scene, as there was no way to determine when defendant might have handled the gun.  Furthermore, defendant argued, none of the eye witnesses were able to provide a sufficiently detailed physical description of the man they saw.  The trial court denied the motion.

D.      *Defense Case*

The defense presented a stipulated expert statement.  The defense expert's conclusions were substantially the same as Cheseldine's.  However, the defense expert also opined, "It is possible that the last individual contacting the handgun is one of the minor contributors."  Furthermore, the defense expert opined that the DNA found on the

---

[2] Defense counsel referred to "1118;" however, the parties agree that the motion to acquit was made pursuant to section 1118.1.

8

ammunition, while not enough to include or exclude defendant as a possible contributor, was consistent with defendant's DNA profile.

*E.        Verdict and Sentence*

On January 27, 2015, the jury found defendant guilty as charged. As to count 1, the jury found true the enhancement allegation that defendant was armed with a firearm within the meaning of section 12022, subdivision (a)(1). After the jury was excused, defendant waived his right to a jury trial on the prior prison term allegations.

The parties appeared for the court trial on defendant's prison priors and sentencing on March 9, 2015. At the hearing, the prosecutor reported that, according to defense counsel, defendant was prepared to admit the three prison priors. Defense counsel confirmed that this was the case, and the following colloquy took place:

"THE COURT:              Okay. [Defendant], you're admitting the three prior prison terms that are charged on the information?

"THE DEFENDANT:      Yeah.

"THE COURT:              Okay. And you understand you have a right to have a trial on those?

"THE DEFENDANT:      Yeah.

"THE COURT:              And I believe you previously waived the right to jury trial, but you have a right to a court trial on those. [¶] And you are going to [forego] that right, is that correct—

"THE DEFENDANT:      Yeah.

"THE COURT:              —and admit the violation with the understandings that with each prison prior, it's an additional one-year term?

"THE DEFENDANT:      Yeah.

"THE COURT:              Okay."

The trial court then sentenced defendant to eight years in state prison.

Defendant filed a timely notice of appeal.

9

## II. DISCUSSION

### A. *Motion for Acquittal*

Defendant contends the trial court erred in denying his motion for acquittal because, at the end of the prosecution's case-in-chief, there was insufficient evidence establishing his identity as the perpetrator of the charged crimes. We disagree.

When ruling on a section 1118.1 motion, the trial court determines whether substantial evidence supports each element of the charged offense, as it stood, at the time the motion is made. (*People v. Cole* (2004) 33 Cal.4th 1158, 1212-1213.) "A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied. [Citation.]" (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)

We review "independently a trial court's ruling under section 1118.1 that the evidence is sufficient to support a conviction." (*People v. Cole, supra,* 33 Cal.4th at p. 1213.) When circumstantial evidence is involved, "[w]e 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.)

Defendant contends that no substantial evidence placed him at the café on the night of the burglary and robbery. We are not convinced. " 'Apropos the question of

identity, to entitle a reviewing court to set aside a jury's finding of guilt the evidence of identity must be so weak as to constitute practically no evidence at all.' [Citations.]" (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 521.) We cannot say, on the record before us, that the evidence of identity at the close of the prosecution's case-in-chief was "so weak as to constitute practically no evidence at all." (*Ibid.*)

At the close of the prosecution's case-in-chief, the evidence showed that defendant matched the eyewitnesses' general description of an African American man wearing dreadlocks, lived near the café at the time of the robbery, admitted to previously committing robberies while concealing his face, and was the major contributor of DNA found on the gun dropped by the perpetrator. Based on the foregoing, a reasonable jury could conclude that defendant was the perpetrator of the charged crimes.

Defendant challenges the sufficiency of the prosecution's evidence of identity, arguing that none of the eyewitnesses identified defendant as the perpetrator. Although none of the eyewitnesses saw the perpetrator's face, they nevertheless offered substantial evidence of identity. All of the eyewitnesses testified that the perpetrator was male. Two eyewitnesses—Lee and Lease—testified that the perpetrator had "dark brown" and "black" skin. Lee also testified that the perpetrator was approximately the same height as defendant. And one of the eyewitnesses—Haro—testified that the perpetrator wore dreadlocks, the same hairstyle as defendant. The other witnesses could not see defendant's hair.

"Our courts have held that it is not necessary that any of the witnesses called to identify the accused should have seen his face. [Citation.] Identification based on other peculiarities may be reasonably sure. Consequently, the identity of a defendant may be established by proof of any peculiarities of size, appearance, similarity of voice, features or clothing." (*People v. Lindsay* (1964) 227 Cal.App.2d 482, 494; see also *People v. James* (1963) 218 Cal.App.2d 166, 170 [evidence of identification sufficient even though robber's face was covered by mask, where witnesses identified him based on his Scottish

11

accent, peculiar walk, clothing, and general appearance].) Here, though none of the eyewitnesses saw the perpetrator's face, they identified other "peculiarities," such as the perpetrator's dreadlocks, which were sufficiently distinctive that the perpetrator made an effort to conceal them.

The fact that Haro was the only eyewitness to see the perpetrator's dreadlocks does not establish a lack of substantial evidence. "The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296.) There was nothing in the record at the close of the prosecution's case-in-chief (or at any time) to suggest that Haro's testimony was physically impossible or inherently improbable.

Defendant argues that Haro's description of the perpetrator was inconsistent with his actual appearance at the time of the crimes. Specifically, defendant argues that Haro's testimony failed to establish his identity as the perpetrator because Haro testified that the perpetrator's dreadlocks were "dark brown," and defendant's dreadlocks were "fire red." Significantly, the only evidence concerning defendant's appearance at the time of the crimes at the close of the prosecution's case-in-chief (or at any time) was defendant's own account to police some ten months later. We reiterate that defendant did not mention the color of his dreadlocks until after he was told that the robber wore dreadlocks. On this record, a jury could reasonably reject defendant's account of his appearance, and conclude that his description of his dreadlocks as "fire red" was merely an attempt to deflect suspicion.

In any case, defendant's self-description, which was explored at length during the prosecution's case-in-chief, does not render Haro's testimony physically impossible or inherently improbable. (*In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497 ["when the circumstances surrounding the identification and its weight are explored at length at trial, [and] where eyewitness identification is believed by the trier of fact, that determination is

12

binding on the reviewing court"].)  Furthermore, any discrepancies in the identification of the perpetrator would  not establish a lack of substantial evidence.  " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.]"  (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)  "Weaknesses and inconsistencies in eyewitness testimony are matters solely for the jury to evaluate." (*People v. Allen* (1985) 165 Cal.App.3d 616, 623; accord, *People v. Echevarria* (1992) 11 Cal.App.4th 444, 453; see *People v. Hill* (1998) 17 Cal.4th 800, 849 [inconsistencies in identification of defendant, who was five feet ten inches tall, where one eyewitness told police perpetrator was five feet four inches to five feet five inches tall, and another eyewitness testified that defendant was definitely not the perpetrator, were "merely discrepancies in the evidence the jury considered and resolved against defendant"].)

Even setting aside the eyewitness identifications, the prosecution presented substantial evidence establishing defendant's identity as the perpetrator.  The prosecution's DNA expert, Cheseldine, testified that defendant was the major contributor of the DNA found on the gun.  Although defendant observes that the DNA could have been placed on the gun before the crimes were committed, a jury could reasonably reject this hypothesis, as defendant himself appeared to do, when he told Var, "Maybe I coulda touched [the gun].  Somebody I let use it.  *But then, then no, 'cuz I want my gun back.*" (Italics added.)

Defendant also observes that "the firearm contained DNA from two other people; indicating that other possible perpetrators had touched it."  "The existence of possible exculpatory explanations, whether they are simply suggestions not excluded by the evidence or even where they could be reasonably deduced from the evidence, could not justify this court's rejecting the determination of the trier of fact that defendant is guilty unless on appeal it 'be made clearly to appear that upon no hypothesis whatever is there

sufficient substantial evidence to support the conclusion reached in [trial court.]' "
(*People v. Redrick* (1961) 55 Cal.2d 282, 290.)  Here, though Cheseldine's testimony
could be reconciled with a finding that "other possible perpetrators" touched the gun, the
evidence at the close of the prosecution's case-in-chief could also reasonably justify a
finding that the gun belonged to defendant, the major contributor responsible for 93% of
the DNA sample.  On the record before us, at the time of the motion to acquit, the jury
could reasonably conclude that Haro and Padilla, each of whom handled the gun
barehanded, were responsible for the remaining 7% of the DNA sample.

Defendant observes that DNA could have been transferred onto the gun by
someone else.  While there may be plausible alternate explanations for how defendant's
DNA came to be on the gun, there was no evidence supporting such a scenario at the
close of the prosecution's case-in-chief (or at any time), and, even if there were, the
existence of such an explanation would not establish a lack of substantial evidence.
(*Redrick, supra,* 55 Cal.2d at p. 290.)  Thus, though defendant's DNA could have been
transferred to the gun by another person, the jury could reasonably accept the more
obvious, and more likely, scenario that defendant dropped the gun during the commission
of the crime.

Defendant also observes that the DNA recovered from the ammunition found in
the gun was inconclusive, and the major contributor to the DNA recovered from the
glove was female.  Once again, however, the existence of circumstances that might
reasonably be reconciled with a finding of innocence does not render the evidence
insubstantial.  (*People v. Earp* (1999) 20 Cal.4th 826, 887-888.)  It was the exclusive
province of the jury to weigh the evidence of defendant's DNA on the gun, which was
conclusive, against the inconclusive evidence of defendant's DNA on the ammunition
and glove.  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  It was also up to the jury to
consider the possibility that the perpetrator may have been a woman.  At the close of the
prosecution's case-in-chief, a reasonable jury could conclude that defendant used the gun

in the commission of the crime, despite the prosecution's inability to show that defendant handled the ammunition or glove.

Finally, defendant argues that his admissions to Var do not establish his identity as the perpetrator. Specifically, defendant argues that many robbers cover their faces and "[r]evolvers are a common type of firearm." These arguments amount to an invitation to reweigh the evidence, which we cannot do. As we have already established, the record shows substantial evidence presented during the prosecution's case-in-chief from which a jury could find beyond a reasonable doubt that defendant was the perpetrator of the crimes. The trial court properly denied defendant's motion for acquittal.

B.      *Challenge to Sufficiency of the Evidence of Identity*

Next, defendant contends that, even considering defendant's evidence, the prosecution failed to establish his identity as the perpetrator of the crimes beyond a reasonable doubt. Just as we have found the evidence of defendant's identity sufficient at the close of the prosecution's case-in-chief, we also find there is sufficient evidence to support the conviction when reviewing the record as a whole.

As noted, the defense presented a stipulated expert statement expressing substantially the same conclusions as Cheseldine. Like Cheseldine, the defense expert concluded that defendant was the major contributor of the DNA found on the gun. The defense expert also concluded that the DNA found on the ammunition, while not enough to include or exclude defendant as a possible contributor, was consistent with defendant's DNA profile.

As previously discussed, the prosecution presented substantial evidence from which a jury could find beyond a reasonable doubt that defendant was the perpetrator of the crimes. The defense case consisted of the stipulated expert statement, which, as defendant acknowledges, was largely consistent with Cheseldine's testimony. Because the prosecution's case-in-chief presented substantial evidence of identity, and because the defense case was, for the most part, a recapitulation of the prosecution's DNA evidence,

15

we conclude that there was substantial evidence of identity on the record as a whole. The defense expert's opinion that the DNA found on the ammunition, though inconclusive, was consistent with defendant's DNA profile, does nothing to alter our conclusion. To the contrary, the jury could have reasonably concluded that the DNA found on the ammunition, though inconclusive, was consistent with defendant's use of the gun in the commission of the crime. Viewing the entire record in the light most favorable to the judgment, we conclude that substantial evidence supports the convictions.

## C.    Alleged Error in Admitting Evidence of Prior Possession of Guns

Defendant contends the trial court erroneously admitted his statement that he had "been caught with" guns in the past.[3] Specifically, defendant argues the evidence was irrelevant, because he admitted having been caught with a .357-caliber revolver, and the gun found at the scene was a .32-caliber revolver. Defendant also argues that the evidence constitutes improper character evidence and, to the extent relevant, was more prejudicial than probative. We agree that the evidence was inadmissible, but find the error harmless.

Generally, "[w]hen the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons. [Citations.]" (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056 [trial court erred in admitting evidence of defendant's prior possession of handgun similar to murder weapon where prosecutor did not claim such weapon was actually used in murders]; see also *People v. Riser* (1956) 47 Cal.2d 566, 577 [trial court erred in admitting evidence of a Colt .38-caliber revolver found in defendant's possession two weeks after murders where evidence showed

---

[3] Defendant does not challenge the admission of his statement that he "likes revolvers."

16

weapon actually used was a Smith and Wesson .38-caliber revolver], overruled on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 648-649; *People v. Archer* (2000) 82 Cal.App.4th 1380, 1384, 1392-1393 [trial court erred in admitting evidence of knives recovered from defendant's residence two years after murder where knives were not murder weapon and were irrelevant to show planning or availability of weapons].)  In other words, "[e]vidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons—a fact of *no relevant* consequence to determination of the guilt or innocence of the defendant.  [Citations.]"  (*People v. Henderson* (1976) 58 Cal.App.3d 349, 360.)

On the other hand, evidence of weapons not actually used in the commission of a crime may be admissible when they are relevant for other purposes.  (*People v. Cox* (2003) 30 Cal.4th 916, 956 ["when weapons are otherwise relevant to the crime's commission, but are not the actual murder weapon, they may still be admissible"], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  The critical inquiry is whether the weapons evidence bears some relevance to the weapons shown to have been involved in the charged crimes, or is being admitted simply as character evidence.  (*People v. Barnwell, supra,* 41 Cal.4th at pp. 1056-1057; *People v. Prince* (2007) 40 Cal.4th 1179, 1248-1249.)

Defendant's statements concerning his prior possession of a .357-caliber revolver were not relevant to the commission of any of the charged crimes, as they involved the use of a .32-caliber revolver.  The People argue that defendant's statements were relevant to the issue of identity, because they tended to show that defendant "was the robber who dropped a revolver (with his DNA) at the Web-Man café."  The People's argument, so far as we understand it, appears to concede that the challenged evidence was offered to show that defendant is the type of person who carries revolvers.  As noted, evidence of

17

weapons not actually used in the commission of a crime cannot be considered for this purpose.

"To be admissible on the issue of identity, an uncharged crime must be highly similar to the charged offenses, so similar as to serve as a signature or fingerprint. [Citations.]" (*People v. Barnwell, supra,* 41 Cal.4th at p. 1056; see also *People v. Harris* (2013) 57 Cal.4th 804, 841 [" 'The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] "The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." [Citation.]' "].) We cannot conclude, on the record before us, that defendant's previous illegal possession of a .357 caliber revolver was so unusual or distinctive as to serve as a signature or fingerprint admissible to prove his identity as to the robber who used a .32 caliber revolver. We therefore conclude that defendant's statements about having been "caught with" revolvers in the past should not have been admitted. Even so, we conclude that the error was harmless.

As previously discussed, the undisputed forensic evidence established that defendant was the major contributor to the DNA found on the gun, raising an overwhelming inference that he was the person who dropped the gun during the commission of the crime. Defendant effectively denied any alternative explanation for how his DNA came to be on the gun when he told Var, "Maybe I coulda touched [the gun]. Somebody I let use it. *But then, then no, 'cuz I want my gun back.*" (Italics added.) The jury heard evidence that the perpetrator was the same race and approximately the same height as defendant, and wore a similar hairstyle. The jury also heard evidence (to which no objection was made) that defendant had previously committed robberies with his face covered and lived near the café at the time of the charged offenses. The jury also heard evidence (to which no objection was made) that

18

defendant would never leave a gun at the scene of a crime, from which the jury could reasonably infer that defendant had illegally possessed guns in the past. On this record, we discern no reasonable probability that the outcome of the trial would have been different had the challenged evidence been excluded. (*People v. Malone* (1988) 47 Cal.3d 1, 22, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Defendant asserts that the jury's questions indicate that the case was close, and the admission of statements concerning his prior possession of guns was prejudicial. Specifically, defendant notes that the jury asked to hear the audiotape of defendant's conversation with Var again, asked when a photograph of defendant was taken, and asked the caliber of the revolver left at the scene. While these factors could suggest a close case (see *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295 ["juror questions and requests to have testimony reread are indications the deliberations were close"]), we perceive no reasonable probability, on the record before us, that the outcome of the trial would have been different had the evidence been excluded, since, as indicated above, there was ample other evidence establishing that defendant had illegally possessed guns in the past. Accordingly, any error in admitting the evidence of the other guns was harmless.

D.      *Defendant's Admission of His Prison Priors*

Finally, defendant contends his admission of the prior prison term allegations was invalid because he was not advised of his constitutional rights to remain silent and confront adverse witnesses. Although the trial court failed to fully advise defendant of his rights, the totality of the circumstances demonstrates that defendant's admission of the prior prison term allegations was voluntary and intelligent. We therefore reject defendant's contention that the error requires reversal.

Before the trial court may accept an admission of the truth of a prior prison term allegation, a defendant must be advised of the right to a jury trial, the right to confront and cross-examine witnesses, and the privilege against self-incrimination. (*People v. Mosby* (2004) 33 Cal.4th 353, 359-360 (*Mosby*); *In re Yurko* (1974) 10 Cal.3d 857, 863.)

19

The appropriate test for determining the validity of an admission of a prior prison term is whether the totality of the circumstances in the record demonstrates the defendant's admission was voluntary and intelligent. (*Mosby, supra,* at pp. 360-361; *People v. Hinton* (2006) 37 Cal.4th 839, 875, fn. 12 ["in discussing the failure to provide specific admonitions of the rights surrendered by the admission of a prior-prison-term allegation, the validity of the admission depends not on express admonitions and waivers but on whether the admission was 'voluntary and intelligent under the totality of the circumstances' "].)

In *People v. Mosby, supra,* 33 Cal.4th 353, our Supreme Court addressed the following issue: "When, immediately after a jury verdict of guilty, a defendant admits a prior conviction after being advised of and waiving only the right to trial, can that admission be voluntary and intelligent, even though the defendant was not told of, and thus did not expressly waive, the concomitant rights to remain silent and to confront adverse witnesses?" (*Id.* at p. 356.) The court concluded that the answer to this question is " 'yes,' if the totality of the circumstances surrounding the admission supports such a conclusion." (*Ibid.*)

In concluding the defendant voluntarily and intelligently admitted the prior conviction despite the incomplete advisement by the trial court, the *Mosby* court explained that the defendant had admitted the prior conviction immediately after a jury found him guilty of the substantive offense following a trial in which he was represented by counsel and did not testify. (*People v. Mosby, supra,* 33 Cal.4th at p. 364.) "Thus, he not only would have known of, but had just exercised, his right to remain silent at trial, forcing the prosecution to prove he had sold cocaine. And, because he had, through counsel, confronted witnesses at that immediately concluded trial, he would have understood that at a trial he had the right of confrontation." (*Ibid.*)

The court added, "[a] review of the entire record also sheds light on defendant's understanding. For instance, 'a defendant's prior experience with the criminal justice

20

system' is, as the United States Supreme Court has concluded, 'relevant to the question [of] whether he knowingly waived constitutional rights.' [Citation.] That is so because previous experience in the criminal justice system is relevant to a recidivist's ' "knowledge and sophistication regarding his [legal] rights." ' [Citations.] Here defendant's prior conviction was based on a plea of guilty, at which he would have received *Boykin-Tahl* advisements. As the Court of Appeal here concluded; '[H]e knew he did not have to admit [the prior conviction] but could have had a jury or court trial, had just participated in a jury trial where he had confronted witnesses and remained silent, and had experience in pleading guilty in the past, namely, the very conviction that he was now admitting.' " (*People v. Mosby, supra,* 33 Cal.4th at p. 365, fn. omitted.)

Having considered the record in its entirety, we conclude that defendant voluntarily and intelligently admitted the prior prison term allegations. Although the trial court erred in failing to advise defendant of his rights to remain silent and confront adverse witnesses, he participated in a jury trial in which he exercised both rights a mere six weeks earlier. Here, as in *Mosby*, defendant exercised his constitutional right to remain silent and, through counsel, vigorously confronted adverse witnesses. (*Mosby, supra,* 33 Cal.4th at p. 364.) Having done so, he would have understood that he had the right to confront witnesses against him.

Relying on *People v. Lloyd* (2015) 236 Cal.App.4th 49 (*Lloyd*), defendant argues that his admission was not voluntary and intelligent, because "the admission to the priors occurred about a month and a half after the verdict, making it likely that [defendant] forgot or confused his rights." *Lloyd* is distinguishable.

In *Lloyd*, a jury found the defendant guilty of assault with a deadly weapon and found true the allegation that he inflicted great bodily injury on the victim. (*Lloyd, supra,* 236 Cal.App.4th at p. 52.) In a bifurcated proceeding conducted more than seven months later, the defendant admitted having served five prior prison terms. (*Id.* at p. 59.) "In the interim, [the] defendant's trial counsel declared a conflict of interest and was relieved as

21

counsel of record, new counsel was appointed to represent [the] defendant, and the matter was continued a number of times for trial on the state prison priors and sentencing." (*Ibid.*)

The Court of Appeal for the Fourth District, Division 3, distinguished *Mosby* noting that "the Supreme Court stressed the defendant's admission 'immediately' followed a trial in which he had *'just'* exercised his right to silence and his right to confrontation, such that it was reasonable to infer he would have been aware of the right to silence and confrontation at the time he entered his admission. [Citation.]" (*Lloyd, supra,* 236 Cal.App.4th at p. 59.) "Here, on the other hand, [the] defendant's admission did not immediately follow his trial. In fact, the admission was not made until seven months later." (*Ibid.*)

In the present case, though defendant's admission did not "immediately" follow the jury trial, the six week period between the verdict and admission was not so long that a reasonable person in defendant's position would have been likely to forget or become confused about his recently exercised rights. (See *United States v. Dawson* (9th Cir. 1999) 193 F.3d 1107, 1110-1111 [the defendant, who had received full advisements in state court action two months before he entered a guilty plea on incomplete advisements in federal court, knowingly waived rights of confrontation and silence despite lack of advisement on either].) Moreover, unlike the defendant in *Lloyd,* defendant does not suggest that he experienced any change in counsel, such that new counsel may have failed to discuss the consequences of his admission with him.

Furthermore, defendant was no stranger to the criminal justice system, having suffered five felony convictions and three misdemeanor convictions in the preceding eleven years. We can infer defendant's understanding of his constitutional rights from his extensive experience with the criminal justice system. (*Mosby, supra,* 33 Cal.4th at p. 365.)

Relying on *Lloyd,* defendant contends his criminal record does not support an inference that he knew his rights when he entered his admission because the appellate record does not disclose whether his prior convictions were based on guilty pleas (at which he would have received *Boykin-Tahl* advisements) or trials. (See *Lloyd*, *supra,* 236 Cal.App.4th at pp. 59-60 ["while the *Mosby* court found the defendant's prior conviction, the result of an earlier guilty plea, lent support to an inference the defendant knew his rights when he entered his admission [citation], the appellate record in this matter does not include information about how defendant was convicted on any of the five felony cases resulting in state prison commitment . . . . Consequently, 'we cannot infer that he would have received advisements in his prior cases.' [Citation.]"].) We are not persuaded. Although we do not know all of the details surrounding defendant's eight prior convictions (in 2004, 2005, 2006, 2007, 2008, 2010, and 2011), all of them necessarily involved either pleas or trials. In either circumstance, we may presume that defendant was either informed of his rights or, as here, exercised them.

In sum, our review of the entire record, including defendant's criminal history, convinces us that his admission was voluntary and intelligent, notwithstanding the trial court's failure to provide complete advisements. We note, however, that a trial court's failure to give full advisements carries a high—and needless—cost. " 'As a consequence of the . . . failure to obtain valid admissions of readily provable serious priors, appeals are filed, briefs are prepared, appellate research and record review are conducted, argument is heard, appellate opinions are written, matters are remanded to trial courts, defendants are transported from prisons to county jails to courtrooms, attorneys are appointed to represent defendants, and prior allegations are belatedly relitigated.' " (*Mosby, supra,* 33 Cal.4th at p. 365, fn. 3, quoting *People v. Garcia* (1996) 45 Cal.App.4th 1242, 1249 (conc. opn. of Woods (Fred), J.); see *People v. Carroll* (1996) 47 Cal.App.4th 892, 897-898, disapproved on other grounds in *Mosby, supra*, at p. 365, fn. 3.) Although reversal is not required under the circumstances here, trial courts are required to give full

advisements and obtain express waivers of the rights to remain silent and confront adverse witnesses.  (*Mosby, supra,* at p. 365, fn. 3.)

### III.  DISPOSITION

The judgment is affirmed.

/S/

RENNER, J.

We concur:

/S/

ROBIE, Acting P. J.

/S/

DUARTE, J.