Filed 12/29/22  P. v. Stepp CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>JASSON MICHAEL STEPP,<br><br>   Defendant and Appellant. | C093769<br><br>(Super. Ct. Nos. 20CF02311, 19CF05855) |

William Chrisman was murdered in a rural part of Butte County.  He was shot eight times, including multiple times in the head, and suffered blunt force trauma to the back of his head.  A jury found defendant Jasson Michael Stepp committed the murder, finding him guilty of second degree murder.

On appeal, defendant raises two claims.  First, he contends the prosecutor misstated the law during closing arguments.  In closing, the prosecutor stated, "I don't have to prove that [defendant] shot the double trouble bullets"—meaning, the two bullets that entered Chrisman's brain.  Defendant argues that because these bullets were the sole

1

cause of Chrisman's death, as even the prosecutor's own expert concluded, the prosecutor did in fact have to prove he fired those bullets to support a murder verdict. Second, he asserts the trial court improperly failed to instruct the jury on involuntary manslaughter, which is a lesser included offense of second degree murder.

We affirm. Although we agree the prosecutor misrepresented the law, we find the prosecutor's isolated comment harmless after considering the whole of the prosecutor's argument, the trial court's instructions to the jury, and the weight of the evidence. We also find no merit to defendant's claim that the trial court should have instructed the jury on involuntary manslaughter.

## BACKGROUND

### I

### *Factual Background*

Chrisman lived in a trailer on a "fairly remote" 75-acre property in Butte County off a short road called Black Bear Road. Arlin Howard owned the property and, together with Chrisman, ran a marijuana growing business on the property. Chrisman grew and sold the marijuana; Howard supplied the land.

On January 4, 2018, Howard went to the property and found Chrisman dead with blood on his head and legs. He called the police. Officers arrived shortly afterward and found Chrisman's stomach still warm to the touch, suggesting he died only minutes or hours before. They found Chrisman had sustained blunt force trauma to the back of his head and, near Chrisman's body, found two tools—a large pulley and a shovel—with apparent blood splatter on them. The pulley also had tufts of hair on it that were consistent with Chrisman's hair. After inspecting the area, officers found tire tracks that could not be traced to any of the patrol cars on the property, bullet holes in the walls of Chrisman's trailer, and two spent shell casings—a 5.56-caliber shell casing and a .22-caliber shell casing—that must have come from two distinct guns.

Officers also found over 346 pounds of marijuana stored on the property. The marijuana was stored in plastic bags and bins. According to Chrisman's romantic partner, who helped Chrisman process the marijuana, about four or five (and possibly more) bins of marijuana were missing, with each bin weighing 13 or 14 pounds and each pound worth between $1,000 and $1,200. Officers asked Howard about the marijuana. Although he eventually acknowledged his role in the marijuana business, he initially claimed not to know about the marijuana or Chrisman's involvement with marijuana.

Officers afterward spoke to others living in the area. One person, who lived on Black Bear Road, said he saw a silver pickup truck with a shell on the back driving south in the direction of Chrisman's trailer earlier in the day. Shortly after, he heard a single gunshot coming from the south and, a little later, saw the same truck driving away from the direction of Chrisman's trailer. He also saw the truck drive by several more times that day.

Another person, who lived on Bloomer Hill Road about a quarter mile from Black Bear Road, had a motion-activated trail camera pointed down his driveway toward the road. Two potential routes lead to Black Bear Road but only one, which passes the trail camera on Bloomer Hill Road, is generally passable in the winter. Photographs from the camera showed a silver Dodge Durango truck with a custom bumper driving toward Black Bear Road and away from Black Bear Road several times on January 4, 2018. The truck first drove toward Black Bear Road at 9:41 a.m. and last drove away from Black Bear Road at 1:50 p.m. The camera also showed Howard's truck going toward Black Bear Road around 2:45 p.m. and other vehicles associated with people who lived or owned property in the area. Officers later asked Chrisman's ex-wife whether she recognized the silver truck. She said she did; it was "related to" defendant.

Around 11:00 p.m., officers drove to defendant's home in Oroville and found him washing his truck—a silver Dodge Durango with a custom bumper. Concerned he might be attempting to destroy evidence, officers detained defendant and seized his truck. On

approaching, officers found two wet car floor mats sitting outside the truck. Both appeared to have been washed. Officers later searched defendant's home and truck. In the truck, they found two air rifle pellets under the driver's seat. In the house, they found a rifle-style pellet gun, which defendant was known to use for hunting, though no firearms.

Officers also found a video surveillance system in defendant's home. Recorded video showed defendant leaving his home in his truck at 9:09 a.m.—32 minutes before the silver truck first appeared on the trail camera on Bloomer Hill Road. It also showed defendant returning home in his truck at 2:24 p.m.—34 minutes after the silver truck last appeared on the trail camera. The video next showed defendant leaving home three minutes later wearing jeans, a sweater, a pair of boots, and carrying a separate pair of boots. It then showed him returning home about two hours later appearing to wear different pants, a different shirt, and different boots. It also showed him cleaning the interior and exterior of his truck for nearly an hour before the officers arrived.[1] Officers later searched defendant's truck but never found the jeans, the sweater, or the boots that defendant wore when he earlier left his home.

After defendant's truck was towed, it left behind muddy tire tread impressions in the driveway. One officer found the impressions "very similar" in "class characteristics, shape and pattern" to those found near Chrisman's trailer. An expert in the field of impression evidence later agreed the two tread marks were similar in pattern. But she could not conclude that those tread marks found near Chrisman's trailer came from defendant's truck.

In the days following Chrisman's death, officers obtained additional evidence. One officer obtained video footage from several businesses in the area showing a truck

---

[1] According to defendant's mother-in-law, it was not unusual for defendant to wash his truck late at night.

similar to defendant's at different locations on January 4, 2018. The footage was consistent with the truck driving toward Chrisman's trailer from defendant's home on the morning of January 4, 2018, and driving toward defendant's home from Chrisman's trailer that afternoon.

Officers also, with the help of two individuals, recovered a mixture of materials belonging to Chrisman and defendant that appeared to have been discarded. Several days after the shooting, two passersby found Chrisman's personal papers and several other items on a road and in an adjacent ravine in Oroville. One found Chrisman's passport, various other documents, and a cooler. The other found Chrisman's checkbook, his address book, several other documents, and a lunch box that Chrisman used to store important items. He also found an empty can of pellets, a notice issued to defendant, and a camouflage face mask. All these items were turned over to law enforcement.

Officers later sought to test several items for DNA, including the face mask found near Chrisman's papers and the pulley and shovel found near Chrisman's trailer. Blood taken from the pulley and shovel was consistent with Chrisman's blood. DNA from the hairs on the pulley was also consistent with Chrisman. DNA from the pulley's handle was consistent with both Chrisman and defendant. And DNA from the face mask was consistent with defendant.

Officers also turned to other sources in their investigation, including defendant's ex-wife and defendant's landline and cell phone data. Defendant's ex-wife said defendant was supposed to pick up his children at 7:45 a.m. on January 4, 2018. But he never showed up and failed to respond to her message about the children until 5:00 p.m. Defendant's landline data showed defendant called Chrisman's cell phone on January 3, 2018. His cell phone data, in turn, showed his phone was used in the same sector as Chrisman's trailer multiple times on January 1, 2018. The trail camera, consistent with the cell phone data, showed a silver truck matching defendant's in the area of Chrisman's trailer that same day. Cell phone data further showed defendant in the same area on other

dates before January 1, 2018. But it showed no activity on defendant's phone from 10:38 p.m. on January 3, 2018, to 2:27 p.m. on January 4, 2018—indicating that during these hours, his phone was turned off, in airplane mode, or beyond the reach of any cell phone towers.

A forensic pathologist performed Chrisman's autopsy. He found Chrisman had been shot eight times, including multiple times in the head, and suffered blunt force trauma to the head. The latter injury caused Chrisman to lose almost a quarter of his blood in minutes and could have been inflicted by the shovel and pulley found near Chrisman's trailer. The pathologist recovered several lead projectiles from Chrisman's body, including three intact bullets (all .22 caliber), two partial bullets mixed with four bullet fragments (also .22 caliber), and one possible pellet. The possible pellet was compared to the two pellets found in defendant's truck. It was similar to one of the pellets but not to the other.

In an autopsy report, the pathologist wrote that the cause of Chrisman's death was hemorrhage and lacerations to the brain due to penetrating gunshot wounds to the head. He also wrote that based on an initial superficial examination at the scene, he believed Chrisman's injuries suggested a "traumatic cause of death consistent with both blunt-force traumatic injuries as well as multiple gunshot wounds." He further said the blunt force trauma would have disabled Chrisman. But after questioning on this topic, he clarified his findings. Although he initially believed Chrisman's cause of death was consistent with both blunt force trauma and multiple gunshot wounds, he ultimately found that Chrisman did not die from the blunt force injuries to his head; he died instead from the two gunshot wounds to his head. He called these two gunshots "double trouble" because the bullets caused both primary brain lacerations from the bullets themselves and secondary brain lacerations from bone fragments entering the brain.

6

II

*Procedural Background*

Defendant was charged with first degree murder.

At the first trial, the jury hung seven to five in favor of guilt. At the second trial, the prosecutor argued in closing that the evidence showed defendant shot and killed Chrisman. Defense counsel countered that the evidence was too weak to place defendant at the scene of the crime and, even if he were present, the evidence did not show he fired the fatal "double trouble" bullets into Chrisman's head. Defense counsel emphasized that the jury could not find defendant guilty unless it concluded he fired those two bullets because, under the jury instructions, a person is not guilty of murder unless the "person actually caused the death."

Responding in rebuttal, the prosecutor maintained that the evidence showed defendant killed Chrisman, even if the evidence was only circumstantial. She argued: "There is no explanation that points to innocence when you look at everything in the totality of the circumstances as you're supposed to. Yes, this is a circumstantial case, but the only reasonable conclusion is that the defendant did it, the defendant committed the act which caused the murder. I don't have to prove that he shot the double trouble bullets. He committed the act, which included the shots." Defense objected that the prosecutor misstated the law. But the court overruled the objection. The prosecutor then added: "He did the act which included the blunt-force trauma to the head, the pellet shot, and the rounds that were fired into Bill Chrisman. The defendant killed Bill Chrisman."

After deliberating for a day, the jury told the trial court it was at an impasse. The court encouraged the jury to continue deliberating and, later that day, the jury reached a verdict. It found defendant not guilty of first degree murder but guilty of second degree murder. The court sentenced defendant to 15 years to life in prison for the murder, plus additional time for crimes in an unrelated case.

Defendant timely appealed.

## DISCUSSION

### I

### *Misstatement of Law*

Defendant first contends the prosecutor improperly told the jury that she "d[id]n't have to prove that he shot the double trouble bullets." He reasons that because the sole acts that caused Chrisman's death were the two gunshot wounds to the head (i.e., "the double trouble bullets"), the prosecutor did in fact have to prove he fired those shots to support a murder verdict. Although we agree the prosecutor's statement was improper, we find no prejudice.

A prosecutor's misstatement of the law, whether purposeful or not, is improper. (*People v. Cortez* (2016) 63 Cal.4th 101, 130 (*Cortez*).) A prosecutor's "[i]mproper comments violate the federal Constitution when they constitute a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. [Citation.] Improper comments falling short of this test nevertheless constitute misconduct under state law if they involve use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*Ibid.*) To establish prosecutorial misconduct under these standards, a defendant need not show that the prosecutor acted in bad faith. (*Ibid.*) But the defendant "does need to 'show that, "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." ' " (*Ibid.*)

In this case, we agree the prosecutor misrepresented the law. She claimed she did not have to prove that defendant fired the bullets into Chrisman's head. But that is not true. To support the murder verdict here, the prosecutor had to prove that defendant committed the act that proximately caused Chrisman's death. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 847 [" '[A] defendant may be liable for murder when he possesses the appropriate mens rea and either the defendant or an accomplice

8

[proximately] causes an unlawful death' ".) And according to the prosecutor's own expert, the acts that proximately caused Chrisman's death were the two gunshots to the head. Putting it all together, then, the prosecutor had to show that defendant fired the bullets into Chrisman's head to support a murder verdict. In claiming otherwise, the prosecutor misrepresented the relevant law on murder.

While we agree the prosecutor misrepresented the law, and although we accept that this misrepresentation rose to the level of prosecutorial misconduct, we find no prejudice from the prosecutor's comment. Because we do not find the prosecutor's isolated misstatement so extensive and egregious as to render the trial fundamentally unfair under the federal Constitution, we consider the prosecutor's comment to be at most a violation of state law. (See *Cortez, supra*, 63 Cal.4th at p. 130.) To evaluate prejudice under these circumstances, we consider whether a reasonable probability exists that the error affected the jury's verdict. (*People v. Espinoza* (1992) 3 Cal.4th 806, 820-821.) We find no such reasonable probability here.

Three primary considerations guide our decision. First, after considering the whole of the prosecutor's argument, we find it significant that the prosecutor's misstatement was a single sentence and unrelated to the primary thrust of her argument. As even defendant appears to acknowledge, the prosecutor's misstatement was brief and isolated—12 words that she said only once and never alluded to again. The comment was also distinct from the primary thrust of the prosecutor's argument—which was not that defendant contributed to Chrisman's murder, even if he did not fire the shots, but instead that defendant alone fired the gun and murdered Chrisman. The prosecutor, indeed, consistently asserted defendant was the sole actor responsible for Chrisman's death. She argued: "Ladies and gentlemen, you know who shot Bill Chrisman. The eviden[ce] has told you. Jasson Stepp killed Bill Chrisman." She argued that "defendant committed the act which caused the murder" and that "the gunshots that penetrated the skull of Mr. Chrisman are what caused his death." And, to give one last example, she

9

argued: "He did the act which included the blunt-force trauma to the head, the pellet shot, and the rounds that were fired into Bill Chrisman. The defendant killed Bill Chrisman." These considerations limit the potential prejudice from the prosecutor's isolated misstatement. (See *People v. Seaton* (2001) 26 Cal.4th 598, 661 [finding no prejudice in part because "the primary thrust of the prosecutor's argument was" unrelated to the prosecutor's misstatement of law]; *People v. Gomez* (2018) 6 Cal.5th 243, 311 [finding no prejudice in part because prosecutor's remark was " 'brief and isolated' "].)

Second, the trial court's written and oral jury instructions also cut against a finding of prejudice. The court correctly informed the jury that defendant needed to "commit[] an act that caused the death of another person" to be guilty of murder—and in the parties' closing arguments, both parties acknowledged that the acts that caused Chrisman's death were the gunshots to the head.[2] The court also admonished the jury to "follow the law as I explain it to you, even if you disagree with it." It further explained: "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." Echoing this admonishment in its closing, the prosecutor told the jury: "Follow the law as it's explained by the judge." We find these instructions important, for "[j]urors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852; see also *Boyde v. California* (1990) 494 U.S. 370, 384 ["arguments of counsel generally carry less weight with a jury than do instructions from the court"].)

We also, unlike defendant, find this presumption applicable even though the trial court overruled the objection to the prosecutor's misstatement. Arguing otherwise,

---

[2] Before the jury deliberated, the prosecutor asked the trial court to instruct the jury about concurrent causes of death and argued the blunt force trauma was a concurrent cause of death. But the trial court disagreed and declined to instruct the jury on concurrent causes of death.

defendant contends we cannot presume the jury followed the court's instructions because the court effectively gave conflicting statements on the law when it overruled his objection. He reasons that the court gave a correct statement of the law when it read the jury instruction on murder and a conflicting incorrect statement of the law when it endorsed the prosecutor's comment. Defendant's argument, we acknowledge, finds some support in case law. As another court has explained, a trial court's failure to sustain an objection to a misstatement of the law can sometimes defeat the presumption that the jury followed the court's instructions. (See *People v. Lloyd* (2015) 236 Cal.App.4th 49, 63 ["In failing to cure the misstatement of law, the court placed its considerable weight behind the misstatement," effectively gave "the jury two conflicting legal interpretations," and defeated the presumption that the jury followed the court's instructions].)

But that is not true in all cases. Our Supreme Court in *Cortez*, for instance, still presumed the jury followed the trial court's instructions on the beyond a reasonable doubt standard even though the prosecutor offered an "incomplete at best" description of this standard—saying " 'it means . . . you look at the evidence and you say, "I believe I know what happened, and my belief is not imaginary" ' "—and even though the trial court overruled an objection to this description. (*Cortez, supra*, 63 Cal.4th at pp. 130-134.) The high court explained that other considerations, including the prosecutor directing the jury to the trial court's instructions, showed "it [wa]s unlikely that jurors would have understood the prosecution's statement . . . to imply either a repudiation of th[e] correct instructions or an invitation that the jury disregard or deviate from them." (*Id.* at p. 133.) Similarly here, we find it significant that the trial court told the jury to follow its instructions (not any conflicting instructions from counsel) and the prosecutor likewise told the jury to follow the court's instructions. Under these circumstances, similar to those in *Cortez*, we find it unlikely that jurors would have understood the prosecutor's comment as an invitation to disregard the trial court's instructions.

11

Third, further pushing against a finding of prejudice, nothing more than speculation showed a separate shooter.  At the heart of defendant's claim of prejudice is the premise that the jury might have found him guilty of murder because he shot Chrisman with a pellet gun and hit him with a pulley or shovel, even if he did not shoot the two bullets into Chrisman's head.  His core claim, then, is premised on the theory of a separate shooter.  But only speculation supports a finding along those lines.  Although much of the evidence points to defendant's involvement in the murder—which the jury necessarily found in reaching its verdict—none of it showed he received assistance.  Even defendant acknowledges that the evidence showed " 'no other vehicles or people connected to the scene.' "  (Cf. *Hooks v. Workman* (10th Cir. 2010) 606 F.3d 715, 728 [finding no prejudicial ineffective assistance of counsel when the defendant's claim was premised on "speculat[ion] that there were more than one perpetrators and that another perpetrator might have been a source" of DNA found at the crime scene].)

To the extent the evidence showed anything on this topic, moreover, it showed defendant acted alone.  Defendant's home surveillance, for instance, showed him getting into his truck alone at 9:09 a.m.  The trail camera on the way to Chrisman's trailer afterward showed a truck matching defendant's heading in the direction of Chrisman's trailer at 9:41 a.m.  Because the drive from defendant's home to the trail camera should, according to one officer, take about 40 to 45 minutes, and because defendant reached the trail camera in a brisk 32 minutes, this suggests defendant did not stop to pick up anyone on his way to Chrisman's home.  Over the next few hours, the trail camera showed a truck matching defendant's heading toward and away from the direction of Chrisman's home.  Defendant's home surveillance later showed him (and no one else) back at home at 2:24 p.m.—34 minutes after the truck was last shown on the trail camera.  All this evidence strongly suggests defendant acted alone.

In the end, we agree the prosecutor misrepresented the law on murder.  But even so, not all misstatements of the law are prejudicial.  And after considering the isolated

12

nature of the prosecutor's misstatement, the whole of the prosecutor's arguments, the trial court's oral instructions, the trial court's written instructions that the jury had during deliberations, and the weight of the evidence, we are satisfied that the prosecutor's comment was not prejudicial. (See *People v. Johnsen* (2021) 10 Cal.5th 1116, 1165-1167 [finding no prejudice after prosecutor mischaracterized the beyond a reasonable doubt standard in several instances; trial court provided the jury with the correct instructions (as did defense counsel) and directed the jury to follow these instructions in the event of any conflicting statements]; *People v. Dalton* (2019) 7 Cal.5th 166, 259-261 [finding similarly]; *People v. Cash* (2002) 28 Cal.4th 703, 734-736 [finding no prejudice after prosecutor misstated the law on robbery; trial court's instructions and the whole of the parties' arguments prevented prejudice]; *People v. Medina* (1995) 11 Cal.4th 694, 760 [finding no prejudice after prosecutor wrongly stated that " '[s]econd degree murder has none of the elements of first degree . . . murder' "; trial court provided jury with correct instructions, it told the jury to follow these instructions in the event of any conflicting statements, and the record shows no jury confusion].)

Defendant, pushing for a contrary conclusion, counters that the prosecutor's misstatement violated the federal Constitution and so should be reviewed under a more demanding standard. But again, to violate the federal Constitution, the prosecutor's improper comments must "constitute a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." (*Cortez, supra*, 63 Cal.4th at p. 130.) We do not find that standard met here. For the same types of reasons covered above—including the isolated nature of the prosecutor's comment and the trial court's clarifying jury instructions—we find "[t]he prosecutor's isolated misstatement clearly was not so extensive and egregious as to render the trial fundamentally unfair, infringing on defendant's federal due process rights." (*Id.* at pp. 135-136 (conc. opn. of Werdegar, J.).)

13

Defendant further argues that no matter the standard used for evaluating prejudice, other considerations show the prosecutor's comment was prejudicial. First, he asserts the prosecutor's comment, together with the trial court's overruling of his objection, prejudicially undermined his counsel's credibility and undermined his defense that the prosecutor could not prove he fired the fatal gunshots. He adds that the prosecutor's comment was particularly harmful because it came in rebuttal, leaving no room for him to respond. Second, turning to the evidence, he contends "the volume of activity that purportedly occurred during this crime spree was enough to raise a significant doubt that only a single person perpetrated it." And lastly, he asserts the jury's actions—including its rejection of the charge of first degree murder—show this was a close case.

Although we agree these considerations are relevant to our analysis, we are ultimately unpersuaded that it is reasonably probable the prosecutor's error affected the jury's verdict. We start with the circumstances of the prosecutor's misstatement, including the timing of the prosecutor's comment (in rebuttal) and the trial court's overruling of defendant's objection. Those considerations, we agree, are important. (See *People v. Centeno* (2014) 60 Cal.4th 659, 676 [noting misstatements in rebuttal are potentially more significant because defense counsel has "no opportunity to counter it with argument of his own"].) But for the reasons already discussed, we find other considerations—including the whole of the prosecutor's argument, the trial court's instructions, and the weight of the evidence—blunted the prejudicial force of the prosecutor's isolated comment.

We turn next to the evidence of a second perpetrator—something we have touched on already. We acknowledge that the crime scene demonstrates a substantial amount of activity. As defendant notes, Chrisman suffered various injuries, multiple items were taken from Chrisman, expended shell casings showed the use of two different guns, and bullet holes in the trailer showed it had been shot from both the passenger's side and driver's side. And as defendant adds, officers neither found the murder weapon nor

14

found defendant with a gun.  Defendant contends these details suggest a second perpetrator.

But again, we find defendant's claim of a separate actor speculative and inconsistent with the evidence.  The evidence as a whole—and particularly the video evidence capturing defendant (and defendant alone) driving toward and away from the direction of Chrisman's trailer—strongly supports a finding that defendant acted alone.  No evidence of solid value favors a contrary finding.  The evidence also provides a ready explanation for the lack of a murder weapon:  Defendant disposed of incriminating evidence.  Two people, for instance, found various items that defendant appeared to have discarded after the murder.  These items included Chrisman's lunch box, his passport, an empty can of pellets, a notice issued to defendant, and a face mask that contained DNA consistent with defendant.  Defendant's home surveillance system, moreover, showed defendant spending nearly an hour cleaning the outside and inside of his car following the murder.  It also showed him leaving home after the murder wearing jeans, a sweater, and boots and carrying a separate pair of boots; and, hours later, it showed him returning home appearing to wear different pants, a different shirt, and different boots.  Officers later searched defendant's truck but never found the jeans, the sweater, or the boots that defendant wore when he earlier left his home.  Considering all the evidence, rather than only the specific evidence defendant highlights, we do not find it reasonably probable the prosecutor's error affected the jury's verdict.

Lastly, we turn to the current and prior jury's actions.  Defendant asserts it is significant that a prior jury hung on the question of whether he committed first degree murder and this jury initially was at an impasse.  He adds that "[t]he jury's rejection of the first degree murder theory suggests it doubted [he] acted alone and fired the gun."  He

15

also contends the jury's request for a readback of the pathologist's testimony shows it "was likely wrestling with the causation issue."[3]

These details are important but a few key considerations undermine defendant's claim of prejudice. First, whatever the reasons for the prior jury's failure to reach a verdict and this jury's initial impasse, we find no evidence that the juries' difficulties concerned the charge of second degree murder. The first jury, for example, hung in evaluating the charge of first degree murder, not the lesser included offense of second degree murder. That consideration lessens the significance of the initial jury's failure to reach a verdict. (See *People v. Guillen* (2014) 227 Cal.App.4th 934, 981, 1016 [rejecting claim that the jury's initial inability to reach a verdict on first degree murder favored a finding of prejudice because "[t]he evidence of appellants' guilt of second degree murder was strong, and once the court removed first degree murder from the jury's consideration, the jury reached its verdicts quickly"]; see also *People v. Jo* (2017) 15 Cal.App.5th 1128, 1175 ["Although a previous hung jury might demonstrate prejudice in some circumstances," it does not always].)

Second, although the jury ultimately rejected the charge of first degree murder, it still necessarily found defendant participated in Chrisman's murder. Even defendant appears to accept that the jury, at the very least, found he inflicted the blunt force trauma on Chrisman. And because nothing more than speculation showed defendant received assistance in his attack on Chrisman, it is difficult to imagine that the jury believed someone other than defendant could have shot Chrisman. Under these circumstances, we

---

[3] The jury also requested readback for one of the witnesses who found Chrisman's belongings on the road, a witness who testified that defendant had a pellet gun, and a witness who, along with defendant, briefly assisted Chrisman's ex-wife in the summer of 2017. It further requested to review the video appearing to show defendant's change of clothes, the DNA expert's PowerPoint presentation, and the prosecutor's PowerPoint presentation.

are not persuaded that "[t]he jury's rejection of the first degree murder theory suggests it doubted [he] acted alone and fired the gun." Nor are we persuaded that the first jury's failure to reach a verdict and the second jury's initial impasse evidenced any similar doubt.

Finally, although the jury requested a readback of the pathologist's testimony, it ultimately issued its verdict before hearing the readback—undermining defendant's reliance on this request. Attempting to reason away the jury's actions, defendant claims "it is understandable the jury did not want to wait" the five days the court believed it would take for the jury to hear the readback. But we decline to engage in this type of speculation. We presume the jury rendered its decision based on the evidence, as the trial court instructed, not based on a desire to be free of jury service. (See *People v. Sanchez, supra*, 26 Cal.4th at p. 852 [jurors are "presumed to have followed the court's instructions"].)

## II

### *Lesser Included Offense*

Defendant next contends the trial court improperly failed to instruct the jury on involuntary manslaughter, which is a lesser included offense of second degree murder. He reasons that the jury could have found he committed no more than involuntary manslaughter even if it accepted that he hit Chrisman on the head with the shovel and pulley. We reject the argument.

"Under California law, trial courts must instruct the jury on lesser included offenses of the charged crime if substantial evidence supports the conclusion that the defendant committed the lesser included offense and not the greater offense." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196.) To conclude that such substantial evidence exists in this case, we would have to conclude that substantial evidence supports the finding that defendant unlawfully killed Chrisman without malice. That is because murder is the

17

unlawful killing of another *with* malice (Pen. Code, § 187, subd. (a)) and manslaughter is the unlawful killing of another *without* malice (*id.*, § 192).

But no such substantial evidence exists in this case. The evidence, again, shows Chrisman was shot eight times, including multiple times in the head, and suffered blunt force trauma to the head. Nothing in the record suggests Chrisman's killer acted defensively, committed these acts accidentally, or had some intent other than an intent to harm Chrisman. Under these facts, no reasonable juror could have concluded that Chrisman's killer lacked either express or implied malice. (See Pen. Code, § 188, subd. (a)(1) ["Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature"], (2) ["Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart"]; see also *People v. Hendricks* (1988) 44 Cal.3d 635, 643 [rejecting claim that trial court should have instructed on involuntary manslaughter when the defendant shot two victims multiple times at close range].)

Nor is there substantial evidence to conclude that someone other than defendant shot Chrisman—which is the premise of defendant's argument. As covered already, nothing more than speculation supports the theory of a separate shooter. And fatal to defendant's argument, speculation is not substantial evidence. (*People v. Crew* (2003) 31 Cal.4th 822, 835 ["speculation" is "not substantial evidence"].) As defendant concedes, his argument has potential merit only if we accept his claim that the jury doubted he discharged the gun. But because we do not accept this claim, we find his argument meritless.

18

## DISPOSITION

The judgment is affirmed.

/s/

BOULWARE EURIE, J.

We concur:

/s/

MAURO, Acting P. J.

/s/

KRAUSE, J.